1  GRELLAS SHAH LLP
   DHAIVAT H. SHAH, ESQ. (SBN 196382)
2  (ds@grellas.com)
   20400 Stevens Creek Blvd, Suite 280
3  Cupertino, CA  95014
   Telephone: (408) 255 - 6310
4  Facsimile:  (408) 255 - 6350

5  Attorneys for Defendant
   JOHN SCHROM
6

7

8              THE UNITED STATES DISTRICT COURT FOR THE

9                 SOUTHERN DISTRICT OF CALIFORNIA

10 | QPID.ME, INC.,                  | Case No.: 13CV0583 IEG NLS
11 |              Plaintiff,         | DECLARATION OF JOHN SCHROM
12 |     v.                          | Date:       July 8, 2013
   |                                 | Time:       10:30 a.m.
13 | JOHN SCHROM, an individual, and | Courtroom:  4D
   | DOES 1 through 10, inclusive,   | Judge:      Hon. Irma E. Gonzalez
14 |
15 |              Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF JOHN SCHROM     Case No.: 13CV0583 IEG NLS

I, John Schrom, declare as follows:

1.     I am the defendant in this action.  I have personal knowledge of all matters stated herein and, if called as a witness, I could and would competently testify thereto.  I make this declaration in support of my Special Motion To Strike.

## My Background, Education and Qualifications

2.     I have a strong interest in health care, technology and how the nexus between health care and technology can serve important human needs.

3.     I am both an epidemiologist and a computer programmer.

4.     I earned my Bachelor of Sciences degree in Chemistry and Biology from the University of Minnesota in 2005.  I earned my Masters in Public Health degree in Epidemiology from the University of Illinois in 2007.

5.     I am currently a Ph. D. student at the University of Minnesota in Health Informatics, with minors in Computer Science and Statistics, with my degree expected in 2015.

6.      I have experience with the following computer languages:  Python, PHP, C++, HTML5, CSS3, D3, SQL, NoSQL, and LaTex.  In addition to my knowledge of programming languages, I have a broad understanding of web technologies (Apache, nginx, AWS, git), machine learning techniques (Association Rules, Neural Networks, SVM), chemistry software (ChemSketch, Marvin), statistical software (R, SAS, SPSS, Matlab), medical record applications (Cerner, EPIC) and other general computer and Internet applications.

7.     My background reflects my focus on public health and technology.

8.     When I was an undergraduate student at the University of Minnesota, I volunteered in campus programs for sexual health awareness and disease education.  In connection with these activities, I discussed current research and news regarding sexual health.  I also developed brochures for

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

1

students containing information regarding sexually transmitted infections ("STI") or HIV.

9.      From November 2004 through 2010, I served as a volunteer Peer Educator for the University of Minnesota.  I was responsible for leading STI/HIV information sessions with high-risk young men (13-24), and answering related sexual health questions.  I also perform outreach and recruitment for an ongoing HIV prevention study.

10.      In the Summer Semester of 2007, I served as a Research Assistant for the Chicago Institute for Health Research and Policy.  I was responsible for processing data for a breast cancer disparities study.

11.      In the Fall Semester of 2007, I was a Teaching Assistant in the Department of Epidemiology at the University of Illinois.  I was responsible for teaching lab sessions for a required graduate-level Epidemiologic Computing course.

12.      From September 2006 through July 2008, I was a Clinical Coordinator for the ambulatory care clinic associated with the Department of Surgical Oncology at the University of Illinois Medical Center.  I performed tasks necessary for the general operation and research activities of the clinic. Among other things, I was responsible for ensuring compliance with hospital standards and goals and with preparing reports relating to clinical care and operations.

13.      From August 2008 through December 2008, I created and managed an HIV testing program for high-risk youth at a drop-in center in Minneapolis, through a grant from the Minnesota Department of Health.  I performed pre-/post-test counseling, rapid HIV testing, and provided referrals for needed services.

14.      From July 2008 through December 2010, I worked as a Data Analyst for Allina Hospitals and Clinics, in Minneapolis.  I provided analytic

DECLARATION OF JOHN SCHROM     Case No.: 13CV0583 IEG NLS

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

support and insured data integrity for the safety surveillance and patient complaints systems.

15.     From January 2010 through July 1, 2011, I worked as a Data Analyst for Hennepin County Medical Center, in Minneapolis, where I provided analytic and epidemiologic support for the largest HIV clinic in Minnesota.  I also interpreted clinical and financial data for hospital leadership, and provided assistance to the County's public health clinic.

16.     I am currently a Research Assistant at the University of Minnesota, where my duties include developing and utilizing data mining and machine learning techniques as they pertain to health data.

17.     I have received recognition, both in the health industry and as a computer programmer, as follows:  Fellow, Rock Health (2012); Finalist, Foursquare Global Hack-a-thon, Twilio Prize (2011); Winner, Health 2.0 "Analyze This!" Developer's Challenge (2011); Fellow, Allina Health Policy Institute (2009).

18.     I have served as a public official at the municipal, county, and state levels, with appointments to the Minnesota HIV Services Planning Council (2008-2010), the Minneapolis Public Health Advisory Committee (2009 – present), and other work groups related to HIV, youth, or public issues.  These bodies are charged with responding to health concerns from their respective constituencies; building comprehensive, data-driven plans for addressing health gaps; making policy recommendations; and allocating federal funds in excess of $10 million.

19.     I have had the following publications and/or speaking engagements: 1) Schrom J., Statement to the Health IT Standards and Policy Committees, Clinical Quality Hearing, June 7, 2012.  2) Schrom J., Schimotzu S., Poplau S., and Larsen K., Predicting Care Coordination Utilization in Minnesota Health Care Homes, Health Equity Summit, April 23, 2012.  3) Pederson K., Koening J.,

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF JOHN SCHROM    Case No.: 13CV0583 IEG NLS

and Schrom J., "Tweeting, HIV & Young Gay/Bi Men," University of Minnesota, Minnesota OUT! Campus Conference, November 13, 2010.  4) Schom J., "National Guideline Clearinghouse," *Encyclopedia of Health Services Research*, Chicago:  Sage Publications, 2009.

20.    Here are additional speaking engagements for which I've applied but have not yet been confirmed:  1) Schrom J., Caraballo P., Castro M. and Simon G., "Quantifying the Effect of Statin Use in Pre-Diabetic Phenotypes Discovered Through Association Rule Mining," American Medical Informatics Association Conference, November 2013.  2) Caraballo P., Castro M., Schrom J., and Simon G., "Survival Association Rule Mining Towards Type 2 Diabetes Risk Assessment," American Medical Informatics Association Conference, November 2013.  3) Schrom J., Schimotzu S., Poplau S., and Larsen K., "Improving Patient Center Medical Home Coordination In A Safety Net Healthcare System Among Adults Living With HIV," American Public Health Association Meeting, November 2013.

**My Experience With Qpid.me**

21.    There are many allegations about me in the complaint that I believe to be untrue.  But the purpose of this declaration is to explain my experiences with Qpid.me as they pertain to Qpid.me's claims that I posted its trade secrets or proprietary information on my personal blog.  For purposes of this declaration, I will focus on that aspect of Qpid.me's allegations.

22.    In November 2010, I attended the American Public Health Association meeting in Denver, Colorado.  While there, I heard about Qpid.me through Twitter.  I retweeted a link to Qpid.me, which apparently caught the attention of Ramin Bastani, the CEO of Qpid.me.  Mr. Bastani contacted me through Twitter to schedule a phone call.  During the call, we basically just introduced ourselves.  Mr. Bastani told me about Qpid.me, and I told Mr. Bastani about my background, training and interests.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD., SUITE 280
CUPERTINO, CA 95014

23.     In March 2011, I won the "Analyze This!" Health 2.0 Developer's Challenge for building "Epicenter," a tool to help epidemiologists find and control disease outbreaks.

24.     On April 1, 2011, I attended Sex::Tech, a sexual health and technology conference.  Mr. Bastani also attended and it was the first time we met in person.

25.     On April 22, 2011, Mr. Bastani flew me to Los Angeles.  We spent the weekend together and discussed the possibility of working together with Qpid.me.  We discussed both my background as an epidemiologist and that I had recently won the Health 2.0 Developer's Challenge.

26.     On July 1, 2011, I quit my job with the Hennepin County Medical Center and joined Qpid.me full-time to work on developing the Qpid.me platform and website.

27.     On December 12, 2011, my "Epicenter" project, for which I had won the Health 2.0 Developers Challenge, was accepted into Rock Health, a healthcare technology startup incubator, and I was admitted into Rock Health's new class of Fellows.  I renamed "Epicenter" to "Epi.md."  Epi.md was a medical informatics startup that aimed, among other things, to develop an Application Programming Interface ("API") that would serve as a point of access to electronic health records.

28.     I discussed my commitments to Rock Health and Epi.md with Mr. Bastani.  He asked me to continue providing transitional services to Qpid.me on a part-time basis, while he found a new full-time developer.

29.     In May 2012, I gave a speech entitled "Is it bad that I get all my medical advice from Reddit?" at the SageBio conference.  The speech revolved around using traditionally non-medical and user-generated data in a clinical context.  I posted a video of the speech on my blog along with an article with the

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

same title.  Mr. Bastani emailed me shortly thereafter to congratulate me on giving a good speech.

30.     In the same month, I also testified before the Health IT Standards and Policies Committees about measure development and "Meaningful Use" Stage 3.  In particular, I testified about the need for a requirement that electronic health records vendors release APIs to facilitate access to electronic health data.  The full text of my speech is also an article in my personal blog entitled "Measure Development."

31.     In August 2012, I posted an article entitled "Hacking HIPAA" to my personal blog.  The article discusses an experience I had with my father, who recently suffered a medical emergency and suffered fragmented care due to a lack of interoperable electronic health records between the emergency care facility and his primary physician.  This was the only article posted to my blog in August 2012.

32.     The article describes my testimony to the Health IT Standards and Policy Committees.  And it also describes the need for a website that could be used to facilitate patient medical information requests,  to automatically make complaints under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for uncooperative healthcare providers, and to allow patients to easily transfer their health records from one health care provider to another.  A true and correct copy of my "Hacking HIPAA" article is attached as **Exhibit 1**.

33.     Several days after I posted "Hacking HIPAA," Mr. Bastani called me and complimented me on another well-written blog post.

34.     For reasons unrelated to my blog, my relationship with Qpid.me and Mr. Bastani deteriorated in late-2012.

35.     On December 17, 2012, Qpid.me terminated my employment.

36.     On January 29, 2013, Mr. Bastani emailed me and demanded that I remove my "Hacking HIPAA" article from my blog on the ground that it

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

DECLARATION OF JOHN SCHROM     Case No.: 13CV0583 IEG NLS

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

contains Qpid.me confidential information.  He further demanded that I provide assurance that I "have not and will not post it anywhere else."  It is this email, as well as the reference in paragraph 31 of the complaint to a blog post made in "August 2012," that leads me to believe that the complaint must be talking about "Hacking HIPAA."  A true and correct copy of Mr. Bastani's email is attached as **Exhibit 2**.

37.    On March 13, 2013, Qpid.me filed this lawsuit.

**"Hacking HIPAA Does Not Disclose Any Qpid.me Confidential Information Or Trade Secrets**

38.    There is nothing in the "Hacking HIPAA" article that is Qpid.me proprietary information or a trade secret.

39.    As stated above, Exhibit 1 is a true and correct copy of "Hacking HIPAA."

40.    "Hacking HIPAA" describes how my father, a Vietnam veteran, recently required emergency room care at a county hospital.  It describes the difficulty that I and my mother had in trying to provide the treating physician with an accurate medical history for my father because the emergency room did not have access to his medical records.  It also details the subsequent difficulty we experienced in having the county emergency room medical records transferred to my father's primary care physician.

41.    I write about the risks of continuity of care, and my view that the lack of interoperable and portable medical records is really inexcusable given the current federal "Meaningful Use" mandate with respect to electronic records as well as the requirements of HIPAA.

42.    I also describe the testimony I gave to the Health IT Standards and Policy Committees, which are tasked with giving recommendations for federal rule-making on electronic health records and Meaningful Use, and how I recommended that electronic health records custodians be required by law to

make APIs available so that applications can be easily developed to allow patients and physicians easy and direct access to electronic health records.

43.     I further propose that one means to facilitate direct patient access, control and portability of their medical records and improve continuity of care, would be to establish a website that serves as a central database for patient medical records.

44.     I then explain how a patient could go to the site, and fill out an online authorization form to have the site request their medical records under HIPAA.  The site would automatically transmit the HIPAA authorization form to the patient's medical records custodians, receive and store any medical records received, and automatically complete a HIPAA complaint on the patient's behalf against any medical records custodians that failed to respond.

45.     Finally, I explain that once the website retrieves the patient's medical records, the patient can direct the website to transfer his or her medical records to any health care provider of his or her choosing.

46.     There are no Qpid.me trade secrets or proprietary information in "Hacking HIPAA."  Everything in that article draws on public information to propose solutions to a public health concern, and one that there is a federal mandate to resolve.  The concept of having a website that collects and allows transfer of patient medical information is not proprietary to Qpid.me and is not a secret.  That a website could facilitate this process by making HIPAA medical records requests on behalf of patients is also not a secret.  I further detail my reasons for saying so below.

**The Federal "Meaningful Use" Mandate Has Made Direct Online Patient Access To Electronic Health Records A Matter Of Priority In The Public Health Arena**

47.     Far from being a secret, the concept that patients should have an online means of direct access and portability to their electronic health records is a

DECLARATION OF JOHN SCHROM    Case No.: 13CV0583 IEG NLS

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

national priority.  The federal "Meaningful Use" mandate originates in the Health Information Technology For Economical and Clinical Health Act of 2009 ("HITECH"), (Pub. L. 111-5, § 2.A.III & B.4).  As a general description, the new law recognized adoption and meaningful use of interoperable electronic records as a critical national goal.  HITECH authorizes the Department of Health and Human Services ("HHS") to establish programs that promote health IT, including electronic health records and private and secure health information exchange.  The concept of "Meaningful Use," at least as I understand it, is that the use of electronic health records should measurably improve the quality of health care.  The law tasked the Health IT Standards and Policies Committees to make recommendations for rule-making to accomplish Meaningful Use objectives.  These committees held hearings to gather information for purposes of developing recommendations, and it was in that context that I gave the testimony I describe earlier.

48.     My understanding is that "Meaningful Use" is to come in 3 stages, with health care providers incentivized with federal stimulus money if they achieved these stages.  HHS recently announced the release of rules for Stage 2 of Meaningful Use.  One of the core objectives of Stage 2 of Meaningful Use is that electronic health records custodians "[p]rovide patients the ability to view on-line, download, and transmit their health information within 4 business days of the information being available to the [provider]."  Further, Stage 2 establishes as certification requirements that electronic health records custodians adopt technologies such that "patients (or their authorized representative(s) be able to view & download their health information online (*i.e.*, Internet/web-based)."  Stage 2 Meaningful Use also requires health records technology to allow patients to have portability of medical information by secure means.

49.     To accomplish these objectives, Stage 2 requires electronic health records custodians to use the "Direct Project," a set of protocols to ensure direct

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

9

patient access to medical records and control over transmission of those records. The Direct Project recognizes the role of a "Health Information Service Provider ("HISP")," which could serve as an intermediary to facilitate the patient's request and transfer of records.

50.     Although the Direct Project does not propose that HISPs use HIPAA to request medical records, the core methodology is what I proposed in my "Hacking HIPAA" article and what Qpid.me does on a more limited scale with STI/HIV tests, *i.e.*, Direct Project establishes that HISPs serve as intermediaries so that patients can make web-based requests for their medical records, such requests can be properly transmitted to medical care providers, and those records can be securely sent back to the HISPs with subsequent transfer of those records to a place of the patient's choosing.

## Qpid.me Discloses Its Use of HIPAA Requests In Its Own Press Releases and Blog Posts

51.     The notion that I have revealed anything secret or proprietary about Qpid.me's methodology is without merit.  More information about Qpid.me's methods can be found in its own blog posts than anything in my "Hacking HIPAA" article.

52.     For instance, on June 5, 2012, Mr. Bastani posted on the Qpid.me website an article entitled "College Students Want IT and (Some) Campus Health Centers Aren't Letting Them Have It."  The article details Qpid.me's methodology of using HIPAA requests:  "Qpid.me empowers patients to get and share their medical records/test results using the Health Insurance Portability and Accountability Act (HIPAA).  And it's made crystal clear in the law that a patient has a right to their medical records. . . .  During the registration process on our website, users fill out, electronically sign (with a mouse or a finger) and fax a valid HIPAA authorization release form to their health care provider, requesting their records be sent back via fax directly into their Qpid.me account.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Qpid.me confirms STD and HIV status once the fax is in users account and enables the user to share their results however they choose." I found this article on the Qpid.me blog at http://qpidme.nationbuilder.com, and printed it to hardcopy on March 31, 2013. A true and correct copy is attached as **Exhibit 3**.

53.   In another article, dated May 23, 2012, Mr. Bastani posted on the Qpid.me website an article entitled "Patients Data Access Rights Under HIPAA and What It Means For Qpid.me Users," in which "Healthcare activist Fret Trotter talks patient data access rights under HIPAA and what it means for Qpid.me users." The article discusses how the Qpid.me website has its users fill out a HIPAA delegation form that Qpid.me uses to instruct healthcare providers to fax patient lab results STI/HIV testing directly to Qpid.me. I found this article on the Qpid.me blog at http://qpidme.nationbuilder.com, and printed it to hardcopy on March 31, 2013. A true and correct copy is attached as **Exhibit 4**.

**Numerous Public Articles Discuss Qpid.me's Use Of HIPAA Requests To Gather Patient Information**

54.   It is obvious that Qpid.me's methodology is no secret. I have found many articles on the Internet, often quoting Mr. Bastani, that discuss Qpid.me's methodology.

55.   For instance, the Huffington Post site, contains an article entitled "Is Sharing STD Results Online The Next Big Thing? Qpid.me Founders Says Yes," dated February 12, 2013. The article details how Qpid.me uses HIPAA requests to gather user STI/HIV testing results: "Once users sign up by providing some basic personal information – like their name, age, phone number – Qpid.me creates a records request that gets e-faxed to their doctor. When the results come back, users are able to share a one-time use link with anyone they want. . . . The site depends on provisions in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) that require doctors to release medical records to patients within a certain number of days . . . ." I found this article at

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

www.huffingtonpost.com, and printed it to hardcopy on March 14, 2013. A true and correct copy is attached as **Exhibit 5**.

56.     On the ABC News website, there is an article entitled "At SXSW, New Sex Apps Focus On That Other Type Of Festival Networking," dated March 10, 2013. Again, it reveals the Qpid.me methodology: "The app allows you to put in the information about yourself and where you were recently tested. Then you sign a HIPAA form, which releases your medical records back to you. The site then sends a fax to your doctor and when they have sent it back to Qpid.me, you get a notification." I found this article at www.abcnews.go.com, and printed it to hardcopy in March 2013. A true and correct copy is attached as **Exhibit 6**.

57.     I actually found many other articles, all in this vein. If the Court wants to see all of them, I am happy to provide the others.

**Qpid.me Has Directly Disclosed Its Methodology For Making HIPAA Requests To Other Web-Based Companies That Gather Patient Information.**

58.     In much greater detail than anything found in "Hacking HIPAA," Qpid.Me has disclosed the intimate details of its methodology for making HIPAA requests to other Health IT companies in the industry.

59.     The instance I am aware of involves a startup called "Motherknows." Based on my review of the description on its website, Motherknows serves as an online portal that allows parents to make secure requests for their children's medical records and then facilitates secure transfer of those records. It also serves as a database so that schools and student camps can have access to medical records. Motherknows has now re-branded itself to the name "CareDox."

60.     Mr. Bastani copied me in email correspondence where he specifically transferred not only the methods by which Qpid.Me requests medical

DECLARATION OF JOHN SCHROM    Case No.: 13CV0583 IEG NLS

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

records (which are public in any event) but the actual forms that Qpid.Me uses to make these requests.

61.     Specifically, on January 24, 2011, Mr. Mohammad Shahangian of Motherknows emailed Mr. Bastani and stated:  "I wanted to follow up with you regarding the process involved in getting the doctors to release medical records. Can you email me any forms involved in this process- from the patient's request to release, to the request from the clinics as well as follow ups with non compliant clinics?"

62.     On February 11, 2011, Mr. Bastani wrote the following in response: "[A]ttached is an example of the 3 page fax I send to get health results + the response from the clinic.  Although it looks really simple, it took me almost a year of work with HIPAA consultants, clinics, feedback & a whole lot of money to get these . . . please do not share."

63.     Mr. Bastani had further email correspondence with Motherknows on July 21, 2011, in which he blind carbon-copied me.  It was at this time that I received the emails described in the preceding paragraphs.  A true and correct copy of these emails is attached as **Exhibit 7**.

64.     Thus, while "Hacking HIPAA" discusses in general terms the need for a central database that facilitates secure patient requests for medical records through HIPAA and the subsequent transfer of those records, Qpid.me not only provides the same level of detail in its public statements but has actually sent its actual HIPAA request forms to third parties.

### Information About My Blog

65.     I have maintained my current weblog, or "blog," since December 2009.

66.     It is available for members of the public to read.  It may be found at the public web domains "www.john.mn," and "www.blog.johnschrom.com."

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

Alternatively, if you enter an organic search on Google for "John Schrom blog," or similar formulations you can find it easily.

67.     In addition to "Hacking HIPAA," I have nine articles published on my blog.  They bear the following titles:  1) "Data Driven Weight Loss"; 2) "Mood Tracking:  the basis of health"; 3) "Improving Measure Development"; 4) "I Get My Medical Advice From Reddit"; 5) "Health Care Meet Foursquare"; 6) "What Is Health Innovation?"; 7) "Open Government Is Public Health"; 8) "Fresh Start"; 9) "HIV Prevention 2.0."  True and correct copies of these articles are attached as **Exhibits 8 through 16**.

68.     On September 7, 2011, I posted an article on my blog entitled "Redefining How You Have Sex."  I removed this article from my blog after leaving employment at Qpid.me.  A true and correct copy of "Redefining How You Have Sex" is attached as **Exhibit 17**.

69.     The article discusses how individuals seeking sexual partners on the Internet practice harm reduction by sharing their STI/HIV status.  It then discusses how I work at Qpid.me, and believe that it could be a game-changer in sexual health because it provides a means for people to provide verifiable disease testing information.

70.     This article was published with Qpid.me's consent.  Prior to publishing "Redefining How You Have Sex," I sent a draft to Mr. Bastani for review and comment.  He told me that he really liked it.  Mr. Bastani also sent it to other business advisors for comment before posting.  For instance, a true and correct copy of an email from Mr. Bastani to Mr. Kevin Clauson, asking him for any comments on my article before I post it, is attached as **Exhibit 18**.

71.     Mr. Bastani liked "Redefining How You Have Sex" so much, that he "tweeted" a link to that article on Twitter, meaning that he essentially re-published it to all of his Twitter followers.  A true and correct copy of a screenshot of Mr. Bastani's tweet is attached as **Exhibit 19**.

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

72.     My blog is one of the forums in which I express my personal views and commentary on public health policy.  The purpose of it is to inform and educate.  None of the articles in my blog contains any information that I understand to be confidential or proprietary to Qpid.me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Minneapolis, Minnesota on May 15, 2013.

_____
/s/
John Schrom

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

CERTIFICATION OF CONCURRENCE

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature (/S/) within this e-filed document.

_____
/s/
Dhaivat H. Shah

DECLARATION OF JOHN SCHROM    Case No.: 13CV0583 IEG NLS

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

1

## **Table of Exhibits**

2

Pages

3      EXHIBIT 1 ................................................................................................ 1

4      EXHIBIT 2 ................................................................................................ 3

5      EXHIBIT 3 ................................................................................................ 5

6      EXHIBIT 4 ................................................................................................ 8

7      EXHIBIT 5 ................................................................................................ 12

8      EXHIBIT 6 ................................................................................................ 14

9      EXHIBIT 7 ................................................................................................ 18

10     EXHIBIT 8 ................................................................................................ 19

11     EXHIBIT 9 ................................................................................................ 25

12     EXHIBIT 10 .............................................................................................. 27

13     EXHIBIT 11 .............................................................................................. 29

14     EXHIBIT 12 .............................................................................................. 31

15     EXHIBIT 13 .............................................................................................. 33

16     EXHIBIT 14 .............................................................................................. 36

17     EXHIBIT 15 .............................................................................................. 39

18     EXHIBIT 16 .............................................................................................. 41

19     EXHIBIT 17 .............................................................................................. 43

20     EXHIBIT 18 .............................................................................................. 46

21     EXHIBIT 19 .............................................................................................. 49

22

23

24

25

26

27

28

GRELLAS SHAH LLP
20400 STEVENS CREEK BLVD, SUITE 280
CUPERTINO, CA 95014

john.mn (/)

# Hacking HIPAA

My dad is a 100% disabled Vietnam vet who lives in an nice condo in downtown Minneapolis.  As a result of his service-related disability, the VA provides all of his medical care for free.  However, the Minneapolis VA does not have a full-time emergency room, so after-hours emergency care gets diverted to other hospitals.

A few weeks ago, my mom came home to find my dad in a worsening medical condition.  She called an ambulance and he was taken to the county hospital.  And I, once again, found myself standing in the emergency room, trying to help my mom provide an accurate medical history for my father to the resident.  After a brief hospital stay, he was discharged and told to follow-up with his primary care provider.

So, this is a problem.  Anyone who has touched our healthcare system, whether as a patient or caregiver or provider, knows that the system is horribly fragmented.  Often, an ambulatory provider within a hospital/clinic system won't know that their patient was admitted to their own hospital.  So, it goes without saying that trying to inform a provider in a different hospital system is nearly impossible in our current system.

This continuity of care task often falls into the laps of patients and caregivers.  So, when my mom called to schedule a follow-up for my dad at the VA, she was told that he would need to come to the VA to sign an authorization for the VA to obtain his medical records from the county.  This, she was told, must occur prior to scheduling the follow-up appointment.

In an age of electronic medical records, meaningful use initiatives, and a decades-old HIPAA law (that "P" stands for portability not privacy, by the way), there is absolutely no reason why my mom should have to take time off work to drive my dad to the hospital to sign a one page form to then have the privilege of scheduling a follow-up appointment after his recent hospitalization.  That's ridiculous.  That mentality does not benefit the patient, and it's not a sustainable activity for an organization that bears the financial risk of a patient (i.e., throwing up artificial barriers to care will only delay necessary medical care, leading to more inpatient and emergency visits).  And, perhaps worst of all, this exact situation happens to thousands of times per year.

**Hacking Health Records**
The easiest solution to this problem, as I testified (http://john.mn/2012/06/improving-measure-development/) at the Health IT Standards and Policy Committees, would be to add a requirement for EHRs to release Application Programming Interfaces (APIs).  That way, applications could easily be developed to help patients have better access and use of their data.  And, in fact, when we started Epi.md, we had hoped to (among other things) become the API layer on top of an EHR.  That's a really hard sell to a really stagnant industry.  However, if hospitals and EHR vendors aren't willing to help patients manage their medical records, then there must be a way to compel them to.

Enter HIPAA.  A patient has the right to receive copies of (most of) their medical records in a manner of their choosing.  They can even use digital signatures to request their medical records.  So why, then, doesn't there exist a single site that manages this process?  It's pretty simple:

1) A patient goes to a site and selects the name of their provider, clinic, or hospital
2) A patient fills in identifying information (name, date of birth)
3) A patient digitally signs the clinic's HIPAA authorization form
4) The site faxes and mails (if necessary) the authorization form to the clinic
5) The clinic responds via fax, mail, or website upload.  If the clinic requires payment, the site can facilitate that process.

Exhibit 1
Page 1

5b) If the clinic doesn't have an electronic solution to collect the data on behalf of the patient. Once the records have been retrieved, the patient can direct the site to forward on documents to any provider they wish.  Further, the site digitizes the documents, and makes the data available via API for other web services.  So, web services wouldn't have to rely on a user to constantly re-enter the same information.  It would be as simple as authing Farmville to use your Facebook data.  And, staying true to the vision of Epi.md, a patient's clinical information isn't what defines who they are.  So, the site will slowly expand to take in additional data that's relevant to a person's well-being.

**Do you have this problem too?**
So, I've been hacking away at this problem, and am looking for a handful of beta testers to try it out.   Additionally, I'm very interested in seeing "After Visit Summaries" that you might receive after an ambulatory visit (it won't be shared beyond me and fellow developers).  So, if you're interested in helping shape a solution to this problem, comment below or contact me.



john@john.mn (mailto:john@john.mn) · @johnschrom (http://www.twitter.com/johnschrom)

Exhibit 1
Page 2



# Removal of "Hacking HIPAA" blog post

**Ramin Bastani** <ramin@qpid.me>                              Tue, Jan 29, 2013 at 7:03 PM
To: John Schrom <john@john.mn>, john@johnschrom.com, johnschrom@gmail.com

Dear John,

In connection with your previous employment with Qpid.me, Inc. (the "Company"), you entered into and agreed to be bound by the Confidential Information and Inventions Assignment Agreement (the "CIAA") dated May 31, 2011 attached hereto and the Transitional Agreement (the "Transition Agreement") attached hereto.

The CIAA and the Transition Agreement (collectively, the "Agreements") require you to protect and maintain in strickest trust and confidence the Company's Confidential Information and Inventions (as defined in the Agreements).

The Company believes you have violated your legal duties under the Agreements by posting "Hacking HIPAA", attached hereto in a PDF and in Screenshots 1-3 from today, on your personal blog (http://john.mn) since August 2, 2012.

Remove it immediately and provide written assurance via email that you have done so and have not and will not post it anywhere else.


Regards,

Ramin Bastani
Qpid.me, Inc.

Q:   Qpid.me Profile (check out my STD status!)
M:   310-925-6220

Twitter | Facebook

---

**6 attachments**



**Screen Shot of Hacking HIPAA 1.png**
169K



**Screen Shot of Hacking HIPAA 2.png**
174K

Exhibit 2
Page 3



**Screen Shot of Hacking HIPAA 3.png**
120K

**John Schrom - CIIAA (executed).pdf**
1177K

**John Schrom - Transitional Agreement (executed).pdf**
1116K

**John Schrom blog "Hacking HIPAA".pdf**
58K

Exhibit 2
Page 4



HOME »

# College Students Want IT and (Some) Campus Health Centers Aren't Letting Them Have It

Posted by Ramin Bastani   175pc   on June 05, 2012

Qpid.me is stirring up fascinating discussions in campus health centers as more and more college students are using our free service to get, confirm and securely share their STD and HIV results / medical records. A few weeks ago we made a big blip on the radar of campus health providers around the country when one campus health center emailed 3000+ student health providers about our service on a Student Health Services Listserv and, naturally, we had to eavesdrop and see what they had to say.

To date, Qpid.me users have gotten their test results from many campuses throughout the country, however most of the campus health providers who posted on the listserv had never heard of or used Qpid.me, so speculation about the service - both good and bad - ran wild. Here are some of the highlights and shocking lowlights from the discussion.

### The Good

*"g-d bless the millennials for pushing all the social networking boundaries and limits –they are the future and they are now."*

*"So as long as [users] take their security seriously, which it's in their very best interest to do, seems like Qpid.me could be very useful and encourage responsibility and regular screening, and perhaps help facilitate those difficult conversations. I personally do like that it specifies exactly what and where [someone] was tested, as so many students say "my partner was tested for everything" which is usually untrue [...] Qpid.me does specifically state that there are other infections that can be transmitted and that one should always use condoms. It is certainly an interesting idea."*

*"Wow. This certainly takes it to a whole other level! Kudos to them if they find this stops or slows down disease spread. Years from now, social networking will morph to such a level that people will be posting their whole DNA genome!"*

### The Misinformed

*"I will not be releasing any medical information consent or not to anyone other than the patient or as legally permitted. Sorry but I am too uncomfortable with this web site!"*

A health care provider should not, and legally cannot, prevent a patient from acquiring their medical records – regardless of their personal discomfort with Qpid.me. And to be clear, the health care provider is releasing the medical information to the patient, as legally required.

*"This is a virtual tattoo, and it cannot be reliably removed once this information is posted. If one of our patients decides that the bohemian lifestyle was over 5 minutes ago, and opens a daycare center... do they want this information online?"*

It's not a virtual tattoo (data is not searchable by search engines). It can be reliably removed.



Qpid.me   Like

234 people like Qpid.me.

Follow @QpidMe   412 followers

Connect Via:

Email address

Twitter Account

Facebook Account

Case 3:13-cv-00583-IEG-NLS   Document 7-2   Filed 05/15/13   Page 24 of 31

And the judgment is appalling.

*"What about confidentiality? This seems to fly in the face of that concept. Call me a dinosaur, but this feels totally off base."*

Qpid.me users have complete confidentiality. Users get their medical records directly from their health care provider and share them however they see fit using their Qpid.me account. And it's not "off base", it's patient empowerment.

*"The website seeks to use libido to promote healthcare, an uncomfortable pairing for me."*

We actually like the pairing! However, a health care providers' discomfort with Qpid.me should not have any impact on fulfilling a patient's request for their medical records.

Some other student health providers felt it was unnecessary for students to use Qpid.me to share their testing results.

*"We can't necessarily prevent students from doing something stupid."*

We can only guess that they've never had a partner lie to them about their testing results (on or offline), or when they were last tested, or lived through the utterly mortifying experience of inquiring about a partner's STD or HIV results.

A majority of listserv conversations centered on the hesitance of the health care provider to release patients' medical records - regardless of whether the patient authorized them to do so.

## Qpid.me User Requests are HIPAA Compliant

Qpid.me empowers patients to get and share their medical records / test results using the Health Insurance Portability and Accountability Act (HIPAA). And it's made crystal clear in the law that a patient has the right to their medical records. Failure to comply with a request for this information in a timely fashion constitutes a violation of Federal and State law.

## How Qpid.me Users Get their Test Results

During the registration process on our website, users fill out, electronically sign (with a mouse or a finger) and fax a valid HIPAA authorization release form to their health care provider, requesting their records be sent back via fax directly into their Qpid.me account. Qpid.me confirms STD and HIV status once the fax is in users account and enables the user to share their results however they choose.

*Testing results are not made publicly available and they are not searchable on the web. Only the user can give access or share them.

## Student Health Centers Risk Violating HIPAA and Patients Rights

Unfortunately, many clinicians and administrators, despite the best of intentions, are violating HIPAA when they refuse a patient's request for their testing results. Moreover, clinicians and health educators are infringing on a patients right to choose how they manage their health in an attempt to protect them from a service they don't fully understand.

## Self-Reported vs. Confirmed Testing Results

To bypass this concern, several clinicians suggested that patients provide their testing results

Exhibit 3
Page 6

2/3

to Qpid.me themselves (aka self-reporting).

*"We provide the test results directly to the patient. The patient can then provide the results to other medical providers or web sites as they wish."*

A critical component of Qpid.me is that we independently confirm the results directly from the clinic to ensure they are valid and accurate. This is what separates someone's Qpid.me results vs. someone on a dating site saying they've recently been "tested."

### Qpid.me Needs to Reach Out to Student Health Care Providers

It's important to note that we have a HUGE amount of respect for the student health care providers doing important work every single day. We know these people are trying and want to always do the right thing.

And this discussion lets us know that we need to greatly step up our outreach efforts to student health professionals – are you one? If so, please email us with feedback, thoughts or if you want to learn more - info@qpid.me.

We've entered a new era in health communication driven by technology. Qpid.me ensures that patients have an easy way to get and share their test results / medical records and that STD and HIV prevention methods are changing with the bell curve of technology and how people communicate in today and tomorrow's world.

How Qpid.Me Works   College Campuses   Listserv   Qpid.Me Misconceptions
Student Health   Qpid.Me

### Do you like this post?

Like   Send   Sign Up to see what your friends like.   **Tweet**

Created with NationBuilder - Theme by Tectonica



HOME »

# Patients Data Access Rights Under HIPAA and What It Means for Qpid.me Users

Posted by Ramin Bastani   175pc   on May 23, 2012

Did you know patients can request their medical records be sent where ever they want? Healthcare activist Fred Trotter talks patients data access rights under HIPAA and what it means for Qpid.me users.

*When I as last active with the Direct Project ST WG, we had made the support of "business card authentication" a fundamental part of the underlying Direct Trust model While we elected not to require the feature in the underlying trust model, we knew it was a critical part to enable in higher level policy. As John Moehrke put in the post above: We have already enabled this through our Address specification. Our trust model needs only not screw it up.*

*The idea was simple. If I walked into my doctor and gave them a direct email address of "fred@direct.fredtrotter.com" they would be able make that work by using some kind of lookup for my public cert (DNS+LDAP etc) and then send an encrypted message to me. They do not need to evaluate whether direct.fredtrotter.com will handle the message properly, or has a certificate from a CA that they trust, or is HIPAA compliant, or really loves puppies.*

*I provided, as the patient, the address, therefore it is presumed trusted. As long as my address can handle the secret handshakes (i.e. provide a public cert in reasonable fashion) after that is "on me" as a patient. We called this concept "business card authentication" because it circumvented the need for patients to go through individual/group assurance process. The fact that the patient gave the clinician the Direct email address -was- the assurance process.*

*This enables me to either host my own Direct account on my own server, as long as I can publish a certificate properly, or to outsource this **to whomever I choose**. Of course, there is the presumption that once an arbitrary patient certificate had been trusted for outgoing messages, that it would be trusted for incoming messages for the specific address only (i.e no need to trust any messages from an entire domain).*

*This is a critical feature for patient data access rights. I am thinking of https://qpid.me/ here. Qpid.me provides a service that makes it easy to share your STD test results with others via SMS. It is a service that helps people use their healthcare records to get laid more often.*

*Already they have healthcare providers who refuse to accept the qpid.me HIPAA delegation in order to receive faxes of patient lab results in flagrant violation of HIPAA. Many providers do not understand that a patient can delegate their HIPAA rights, and therefore request to have their patient records sent where ever they want already. No matter what anyone thinks of the Qpid.me concept, it is perfectly legal and well within the patient legal rights. But because providers misunderstand*

Connect Via:

Email address

Twitter Account

Facebook Account



Qpid.me
Like

234 people like Qpid.me.

Follow @QpidMe   412 followers

HIPAA, they frequently presume to "protect the patients privacy" by refusing to share data in the manner that the patients prefer. Legally HIPAA gave patients tremendous access to their own data, practically it often creates a barrier. I am concerned that the same thing will happen with the MU Direct mandate.

The current MU proposed rule says "Both the patient and EHR technology are authenticated;". This vague language, in my mind, will substantially work against the patients ability to get their data sent "wherever they want". The MU rules do not actually specify the "direct project" but they obviously include it by reference. The directproject.org sometimes points to http://www.directtrust.org/ for these types of issues.

It makes sense that this issue should be proposed and discussed on these forums, knowing that dissenters to the discussion here will be free (and encouraged) to register their dissent as comments in the MU rulemaking.

As far as I am concerned, without the explicit ability for patients to call foul when a clinician refuses to share data for "security purposes" patients will remain second class citizens on the Direct network. The same seems true for removing certificates to prevent "spam" from a patient that turns out to be legally binding requests for amendments to medical records under HIPAA. It also seems obvious that this right, in conformance with the current HIPAA delegation rights, should be something that I can confer on someone else. If I decide that I trust healthvault to be my "direct address" as a patient, then the healthcare provider cannot decide if direct.healthvault.com publishes a trustworthy public key. If that is the key that enables communication with my address they have to import it for the purpose of communicating directly with me. Similarly, if I provide the email offred.trotter@direct.qpid.me then the provider should not be able to "decide" if the qpid.me security practices are acceptable. Such a decision really devolves into a decision about whether the services that qpid.me are "moral" in the eyes of particular providers.

Please let me short circuit some of the discussion around this issue on several points.

First I know about the risks of patient fat-fingers. It is not our responsibility as engineers or clinicians to prevent them from doing stupid things. We need to inform them about the consequences of decisions. But decisions that I consider "stupid" or "dangerous" from a privacy/security perspective might be "right" for a particular patient. qpid.me is a perfect example of a service that will be controversial to many healthcare providers, but is well within patient data rights.

Second I understand that the HITSP has recommended: ONC from the HITPC that all digital certificates used within the Security and Trust Framework of Directed exchange be issued by an FBCA cross-certified Certificate Authority to individuals only. (PS where is the official link for this recommendation, I just find discussion)

This recommendation clearly refers only to provider to provider communication. This makes sense, the "privacy tiger team" is made of institutional thinkers and their rational for this decision was apparently The team made this recommendation because "virtually every healthcare organization will at some point need to exchange health information with a federal health agency,"

That rational is quite true, for healthcare organizations. For provider-to-patient

*communication this is ridiculous statement. Personally, I think any CA that is cross-bridge certified is fundamentally untrustworthy. 10 years ago, I would have considered someone saying things like that to be tin-foil-hat paranoid, but recent security breaches at CA's that hold cross-bridge certification and the way they are handled, along with the NSA/AT&T wiretapping scandals provide pretty substantial evidence that such fears are warranted.*

*I would consider it an ethical error to recommend that a service like qpid.me, which transacts substantially regarding HIV information, put themselves in a position to rely on Federal Cross Bridge CAs.*

*The whole point here is that qpid.me and services like them hope to use Direct precisely to cross the HIPAA-covered not-covered threshold. The rational for Cross Bridge certification does not even remotely apply here. The notion that it even **could** apply has deeply troubling implications for individual liberty.*

*The provider-to-patient bridge is not just the trust bridge that connects innovative services to the new Health Internet. It is also the bridge that makes the Direct Project into an international health exchange protocol rather than just a US protocol. The Cross Bridge requirement would prevent me, as a patient from sending to providers who were not cross bridge certified, which would of course include providers in other countries with different CA requirements.*

*I wish that I could propose some kind of real alternative to "business card authentication" that would serve patients better. But any additional complexity will be used by providers as a excuse to "protect patient privacy" by not exchanging data with a given patient at all. The business card authentication, with all of its potential hiccups and certificate discovery difficulties, represents a clear line: "providers must trust patients with their own data"*

*Any alternative, from "federal bridge blah blah" to "the markle framework for patient goodness" to "patient friendly CA network" or "DirectTrust endorsed CAs" all amount to the same thing, some third party deciding for patients what is OK or not OK to do with their data.*

*Will patients get duped? Will patients be burned? Will we have a little chaos around this idea? Sure and that sucks. But consider the alternative: a perpetuation of this problem.*

*Really, I would be happy to be proved wrong about this. Requiring providers to accept business card authentication from patients (i.e. if patient gives a Direct address the provider has to trust the corresponding certs and enable communication) is the only thing that I can think of that busts the red-tape around CA trust issues, and ensures that patients can send their health data where-ever they choose. Is there any other technical design that guarantees that the patient preference trumps trust politics?*

via DirectTrust.org

    Access    HIPAA    Patients Rights    Qpid.Me

## Do you like this post?

Like    Send    Sign Up to see what your friends like.    Tweet

Created with NationBuilder - Theme by Tectonica

Exhibit 4
Page 11

3/14/13                                Is Sharing STD Results Online The Next Big Thing? Qpid.me Founder Says Yes

Case 3:13-cv-00583-IEG-NLS   Document 7-2   Filed 05/15/13   Page 30 of 31



March 14, 2013

# HUFF POST WOMEN

---

# Is Sharing STD Results Online The Next Big Thing? Qpid.me Founder Says Yes

Posted: 02/13/2013 5:44 pm EST | Updated: 02/14/2013 3:28 pm EST

---

Lisa, 24, has been single for years. She loves to date and takes her sexual health very seriously. However, when it comes time to talk testing, things have been known to get awkward.

"I can get kind of shy," she said, admitting she's been with men and never brought up STDs because she was nervous. "Now, I can just send them a text message. It does the talking for me."

Yes, a text message. Lisa, who asked that only her first name be used in order to protect her privacy, is an frequent user of Qpid.me, a free website that helps anyone age 13 and up request their STD results from their doctor or clinic and share them with a potential partner via text message or an emailed link.

"We've generally been taught to keep this information very private, and this represents a paradigm shift," said site founder and CEO Ramin Bastani. "We think the shareability of that information -- verified information -- is absolutely critical," he said, likening the site to the "modern, flirtatious" version of "I'll show you mine if you show me yours."

Once users give sign up by providing some basic personal information -- like their name, age, phone number -- Qpid.me creates a records request that gets e-faxed to their doctor. When the results come back, users are able to share a one-time use link with anyone they want. The site shares results for HIV, gonorrhea, chlamydia, syphilis, hepatitis C antibody, as well as the HPV and hepatitis A vaccines, but does not include HPV and herpes status.



Proponents of the site say it empowers users to get and stay on top of their STD results in an easy way. For too long, health care providers have told patients that "no news is good news," said Dr. Jeffrey Klausner, a professor of medicine and public health at UCLA who serves as a medical advisor to Qpid.me.

"People have a right to that information," he said, adding that "anything that promotes more conversation, more dialogues and more transparency in sexuality is a good thing."

Qpid.me -- which joins other sites like U Should Know and inSPOT (the latter sends anonymous postcards from users to past sexual partners saying that the user has since been diagnosed with an STD) -- could also be a promising public health tool, Klausner said. The site speaks to a new, tech-savvy generation, he said. The Centers for Disease Control and Prevention estimates that 20 million new STD infections occur every year in the U.S., and half are among 15- to 24-year-olds. In young women, the consequences can be particularly devastating -- the CDC also estimates that undiagnosed STDs cause nearly 25,000 women to become infertile every year.

The site is also trying to make inroads in the booming e-dating scene. "A lot of people are using this [with] online dating," said Bastani. Reporting one's STD status has been popular practice on gay dating sites for years, he said -- people label themselves "DD free" or "drug and disease free." The hope, he said, is that this practice will pick up on other sites as well.

At the moment, the site is small. Though he would not give The Huffington Post hard numbers, Bastani said Qpid.me currently has thousands of users, but not tens of thousands. And there are questions about scaleability. The site depends on provisions in The Health Insurance Portability and Accountability Act of 1996 (HIPAA) that require doctors to release medical records to patients within a certain number of days, and some experts question whether practices have the manpower to send those records along in a timely manner if the site takes off.

Exhibit 5
Page 12

"We just [wouldn't] have the administrative staff to really comply with that," said Dr. Carolyn Westhoff, a professor of clinical population and family health at Columbia University's Mailman School of Public Health and director of the Harlem Health Promotion Center. "If you have a huge clinical program, like a Planned Parenthood or a city department of health site, I would see difficulties in being able to devote the time to get people these records." Indeed, Klausner said there have already been instances in which providers have not responded to requests for records.

The site also raises privacy concerns. Qpid.me says it takes "commercially reasonable technical precautions to help keep data secure," but Bastani said that there is no way to guarantee that it will never be hacked. But, he said, the site is completely opt-in; if people have any qualms about using it, they do not have to.

"Once your health information is released from your provider, it is no longer covered by HIPAA and it is usually not covered by state laws," said Alice Leiter, policy counsel for the non-profit Center for Democracy & Technology. "Services like this are great, but people need to go into it with their eyes wide open." Users assume a level of responsibility over their health records that they did not have before it was released by their doctor, she said. "The information is less secure than it was before it started getting emailed or texted around."

Lisa, who despite being an early adopter of the site insists she is not a "computer person" and does not embrace social media sites like Facebook, said that some female and male friends she's told about the site have been put off by concerns about privacy, but most have embraced it. One friend who uses online dating sites purely for "booty calls" absolutely loves the site, Lisa said. And all of the men to whom she's sent her results have responded in kind.

"It feels like of like you're a kid in grade school, and you throw a note at someone, like, 'Lisa's been tested two months ago. Here's the link you can use one time,'" she said. "For me, it's so much easier."

Exhibit 5
Page 13